The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having in their manner, form, or business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning. Please be seated. We're happy to hear argument in our first case, United States v. Woodson. Mr. Schultz. May it please the Court, Benjamin Schultz on behalf of the United States. The district court in this case committed clear error and indeed committed many of the same errors that caused this court to reverse in Wooden 1. Several errors in particular stand out. For one thing, in rejecting the pedophilia diagnosis, the district court instead offered the idea that Wooden's past sexual misadventures and his past preferences for young boys resulted from a developmental delay of 10 to 15 years coupled with the physical and hormonal changes of being a teenager and young adult. That was already a questionable explanation for Wooden's behavior into his late 20s, and it really didn't explain Wooden's past misbehavior and sexual predilections in his late 40s, and yet the district court failed to address at all that inconsistency. Furthermore, the district court credited Wooden's own self-report that he was no longer attracted to young boys, but by Wooden's own admission that change in his preferences occurred in 2002. Yet if that was true, that in no way explains the very substantial evidence that in the 2002 to 2005 period, when Wooden was last out in the community, he continued to have and may even have acted upon those urges. And indeed, that was what this court emphasized when it reversed the district court in Wooden 1. Third, the district court did not sufficiently address Dr. Malonek's testimony, where he ultimately accepted here, did not fit the pattern of Wooden's past crimes. IDD is something that would make an individual more gullible and likely to be a victim, and yet the kinds of crimes that Wooden committed were crimes where he would lure a boy aggressively to a secluded location and then aggressively and forcibly engage in sexual offenses. The district court should have addressed that, and the district court's rejection of the consider these key pieces of evidence that the district court did not address. And do you handle a number of these cases? I have handled some of them. There's plenty of others in the government who also handle these. Does anyone ever get out? Your Honor, my understanding is that there have been – Your Honor, I'm not sure if there have – you mean do they get out after being originally committed? Indeed. I think this court – Your Honor, I'm not sure that there have been many 4247s that have been adjudicated just because of the timeline of these. But that's what I asked you. Right. That was part of my first question. Sure. I don't specifically know the answer to that. You don't know of one that has been released. Your Honor, I am not personally aware of one, but my understanding is also just the timeline of these have been that there just haven't been very many 4247H petitions in the Adam Walsh Act context yet. Our standard is – what is our standard with review of the district court case? It's clear error, and we fully acknowledge that. And that is why all that we are asking this court to do is to do the same thing that it did in Wooden 1, which is to recognize that there is very substantial evidence that the district court should have accounted, and that was intentioned with its analysis, but the district court did not address. Well, the district – no, go ahead. I was just going to say, one of the things that I was struck with was the lack of proof in – I forgot exactly how this is phrased, but the ability to overcome or the ability to change. And it seemed to me that the only way that someone would be able to prove that is to engage in counseling. Your Honor, that may be the – Is there any other way? Your Honor, I think it would really just be a fact-dependent question. Well, I understand that, but can you posit for me two or three other factual scenarios where it might be proved? Sure. And again, I'm not a psychological expert, but I could imagine – You're a lawyer. Certainly, Your Honor. I could imagine that someone suffers from the kind of condition that for one reason or another could be in remission or could be treatable with medical interventions or could be medicated. Again, I'm just hypothesizing. I'm not a psychological expert. But indeed, the statute even presupposes that sometimes an individual could be conditionally released such that if they're ordered to take medication – I understand that, but still it would be released. You don't – you're not enthusiastic about this person being released at all, are you, conditionally, non-conditionally? Your Honor, the government's view was that this individual was not appropriate for conditional release. But again, that doesn't mean that the only way to get release is to enter sex offender treatment. It would, again, it would be a fact-bound determination that the district court would have to weigh. I understand it's a fact-bound consideration. Considering the facts, I couldn't find another basis on which the government would agree, might agree, that there has been a change. And I'm not sure you've given me one. But Judge Keenan has a question. Do we have to find Dr. Winsman was not a credible witness? No, I don't think this court has to do that at all. I think – Because he did have a theory. You know, last time they didn't really have a theory. Well, Your Honor, I think – That made clear – I mean, you know, Dr. Plott testified, I know. But it wasn't as well-developed as it was this time. Well, Your Honor, I think as this court made clear in Wooden 2, what the court had concluded in Wooden 1 was not that the government was definitively right, but all that the court had concluded in Wooden 1 was that the analysis that the district court had engaged in was an incomplete analysis and it needed to account for various key inconsistencies in the record. And that's all that we're asking the district court to do here. But with Dr. Winsman now in the court seeming to embrace wholesale Dr. Winsman's point of view, why did the district court have to address more? Certainly it would have been better if the district court had addressed things, but why is it reversible error? Well, first of all – The court clearly accepted one expert and rejected others. A couple of reasons, Your Honor. The first thing I want to make clear is I don't think it would be accurate to say that the district court wholesale adopted Dr. Winsman's testimony. There's a couple reasons for that. First, the 10 to 15-year developmental delay was not something that I think Dr. Winsman testified to at all. That was a gloss that the district court put on his composite understanding of Dr. Winsman and Dr. Plott's testimony. What did the district court reject about Dr. Winsman's testimony? I agree with you that there's no – Dr. Winsman said, Axson, I reject that. But nonetheless, the district court seemed to think that there was this 10 to 15-year developmental delay. That was not a particular aspect of the theory that Dr. Winsman had proffered, and it is a theory that the district court accepted and we think is very much in contravention of the evidence. Furthermore, the district court said that it was accepting Dr. Winsman and Dr. Plott's testimony. There were distinctions between the testimony. Dr. Plott even acknowledged that he would diagnose pedophilia, but then he tried to retreat from that somewhat. It was a little bit ambiguous. Dr. Winsman rejected pedophilia and said that he wouldn't even diagnose pedophilia at all. So, again, I think the idea that the district court here was just wholesale adopting the experts and not doing any of its independent way or independent thought doesn't quite square with the evidence. But the more important point here, and I want to make sure the court really does get this, is we are not here saying that it would be impossible on this record for the district court to conclude that Mr. Wooden should be released, and we're not here saying that it would be impossible for a fact finder to ultimately credit Dr. Winsman or Dr. Plott's testimony. But what we are saying is exactly what this court said in Wooden 1, which is at the end of the day what clear error analysis is about is you're trying to make sure the district court's fact finding was sufficiently principled. And here we don't think the fact finding was sufficiently principled because there are these key, really important pieces of evidence inconsistent with the district court's analysis that the district court needs to address. And that's all that we're asking the court to do is to send it back so that the court can consider that. If there are further questions, I'd be happy to address them. Before you quit, I'd like to hear you on the question of whether or not any release should be conditioned. Sure. The government's experts did not believe that conditional release was appropriate, but we do think that that is something that is authorized in a Section 4247H hearing. And to the extent that the district court's opinion depended on the idea that upon release he was going to have treatment, he was going to live with his sister, then we do think the district court should have considered whether or not to make those conditions of his release. But the government's expert's view was that no release was appropriate. But the district court believed he did not have the authority to put conditions or did he decide he didn't have the authority? The district court did not explicitly address that question. Because the court agreed that the burden of proof was preponderance of the evidence, I think a fair inference was that the district court probably believed that 4247H proceedings are shaped by 4248E proceedings, which is the position that the government takes and which is the position that we believe was implicit in this court's recent opinion in McLaren, which we just filed a 28-J letter on. I'm not sure if the court has had the chance to see that yet. But I didn't read anything in the district court's opinion to say that he had actually explicitly addressed and considered conditional release or that he had explicitly made any conclusion one way or the other as to whether or not that was something he had to consider. So how do we resolve that? Do we presume the judge knows the law or does it require some explicit binding by him? He is or is not going to do it? Your Honor, I think in this case one of the difficulties is that it is unclear from the district court's opinion whether its volitional control analysis depends on the idea that he's going to have this treatment plan and he's going to live with his sister. If it does depend on that, then we think the release should have been conditional. Thank you very much. You have some rebuttal time. Good morning. Good morning. May it please the court, my name is Deborah Graves. I am a former assistant federal public defender in the Eastern District of North Carolina. I retired two years ago. But I continue to represent Walter Wood and I'm here today on his behalf pro bono along with the Office of the Federal Public Defender, which continues to represent him. The district court's factual findings are supported by abundant evidence in the record. Therefore, the government has not shown clear error in this case. First, as to the finding that Walter Wooden suffers from intellectual developmental disorder and not a paraphernalia, it is clear that the district court relied heavily on the testimony of Dr. Fred Winsman. Can you put the microphone just a little closer to you? Sure. Thank you. It is clear that the district court relied heavily on the testimony of Dr. Fred Winsman to do so. Dr. Winsman is the only expert who tested Walter Wooden's intelligence. He is the only expert who spoke with members of Walter Wooden's family in order to assess his developmental functional intelligence. Did Dr. Winsman offer any objective sources, scholarly writings or studies or anything to support his opinion? Yes, he did. And where would I find that? In his evaluation. He has a number of sites to authorities in the back of his evaluation. And also Dr. Winsman himself is an authority specifically on the issue of volitional control. He is the only published expert in the area of volitional control as it relates to sex offenders. Did the district court ever explain its earlier finding that Wooden was volitionally impaired? It seems to me the district court leaves a big gap there. It doesn't really say why its new finding of IDD takes away or eliminates the concern of volitional impairment that the court had in its prior finding. Well, there are a couple of things that I'd like to say about that. And I don't want to get into trouble and I don't want to speak for the district court. I think the district court speaks pretty well for itself. But it appears that the district court wanted to release Mr. Wooden initially. Indeed. And the district court followed the guidance of this court and committed him. The district court did not find that he lacked volitional control initially, but it followed the guidance of this court and it accepted the guidance of this court and committed him. And I think Judge Boyle even stated that on the record. But what is different about the IDD diagnosis is that for the first time, someone actually has looked at Walter Wooden as a whole person and put his offending in context. And that had not happened before. We would concede that there were some things lacking in the testimony of Dr. Campbell, God rest his soul, initially at the first case. He's now deceased. But those things are certainly not lacking here. Well, I still wasn't sure what proof, what backed up his theory that IDD can explain a person's sex offenses against children. And you say that these things that he cited suggest that theory. See, I didn't think they did. I think they went to sort of his general expertise as a psychologist. I think that's part of it. But I also think the best explanation for it is in the testimony of Dr. Plott. Because the government specifically asked during cross-examination of Dr. Winsman about, so what is it, are you saying that because he was mentally a five-year-old, that he was out offending against five-year-olds? You know, that doesn't follow. And what Dr. Plott says is that because he has the mental age of a five-year-old, but he has the physical urges of a teenager, that is what led to his offending. Did any of the doctors, though, put this in the sequence of the events that took place in 2004 and 2005 when Mr. Wooden was in his 40s? Mr. Wooden did not commit a hands-on offense in his 40s. Right. He did. There was an episode regarding luring the child into the basement. That was a dream. And actually a nightmare. The best case for you is the dream. A nightmare. There was evidence he was babysitting children during that time, was there not? You know, I think there's a big question about whether there was evidence that he was babysitting children. Mr. Wooden told his probation officer that he was babysitting. But you have to understand, when a person has IDD, they try to make themselves look like they're doing something good and something important, even when it actually undercuts what they're actually doing. So he's claiming that he's babysitting because he's trying to convince his parole officer that he's working, that he's making money. But you want us to credit Mr. Wooden's testimony with respect to everything else. Absolutely. Why would we credit it with respect to that? Well, what I want you to do is put his testimony in context of who he is. And when I look at, for example, when you want to look at what it is that lets you know that Mr. Wooden has developed, you look at what Dr. Shira said. She's the government witness. She testified that people with intellectual disabilities learn at a lower rate and that the ultimate result, even when they go through treatment, is that they respond at a lower level. The expectations remain low. And I'll cite you to JA 585 where she testifies about what the expectations are, what the maximum benefit is of treatment for someone with Mr. Wooden's disability. She says, they're not going to attain the same level of insight as one of us would obtain in treatment. So the ceiling is lower for them. Once we feel that they've reached the maximum benefit, then they're released from treatment. And some would say, okay, they can follow rules. They have the ability to resist offending. They have the desire to resist offending. They display good social boundaries with their peers and with staff, meaning that they're not touching people inappropriately. They're showing some level of awareness that they did things that were unhealthy in the past. They've indicated they're not going to do these things anymore. They're not going to say, I had these cognitive distortions, and that's what led me to do what I did. They don't have the ability to do that. Did they reject treatment? Is that part of the ITD, that they reject treatment? No, Your Honor. Because the record does show that he rejected treatment. No, Your Honor. What I'm saying is that of course, but rejecting treatment is not a indication that he's dangerous. It's never been used as an indication that he's dangerous. Well, accepting treatment and having someone who treated you saying you are no longer dangerous is an indication that you are no longer dangerous. What's his reason for rejecting treatment, that everybody was having sex all the time? It does raise some questions in itself, doesn't it? There are a number of reasons for individuals to reject treatment at the Butner facility. And we've seen, especially with people who were certified early on, that there's a certain lack of trust amongst them and the folks who provide the treatment. And our district court judges are aware of that, that it's difficult for them to get past the hurdle of all of the things that have gone on before in getting them certified and betraying their trust and getting them to think that this program is now going to help them. So I think the district court doesn't weigh that as heavily against Mr. Wooden in light of that situation. And also, Mr. Wooden, he's never really – what you have to understand about someone who is intellectually disabled is that their rationale for things is not going to be as simple or straightforward as yours or mine. So I think it's fair to say your case rests on the diagnosis of intellectual disability, Mr. Wood, right? Yes, I would say so. So if his intellectual disability caused him to sexually abuse minors, why isn't it something that would get him considered a serious mental disability or disorder under the Adam Walsh Act? Well, there are a couple of things. First, I think the question is whether a non-paraphernalia can serve as a basis for commitment under the Adam Walsh Act. And this court, I believe, in a number of cases has said that it cannot. Well, it's just when the pedophilia took place. I don't think I understand that. I'm sorry, maybe I don't understand your question. Well, you're saying some mental disability caused him to become a pedophilia. So he was a pedophilia. Well, I'm saying that he certainly committed what would be considered pedophilic acts. But I'm not saying necessarily they had pedophilia, although the DSM does contemplate that someone could have pedophilia and it could wane. Sexual urges towards children could certainly wane over time. So that's on the one hand. But on the other, I think that what the difference is that Walter Wooden has grown. He has matured. And that's what happens with people with IDD. They develop, but at an incrementally slower rate. Walter Wooden is now 60 years old. He hasn't offended against a child since he was 27. Well, but still he was putting himself in situations, or at least there was evidence that he had told the probation officer in 2004 that he was babysitting. And he is no longer indicating that he would do anything like that. And all we ever have in these cases are the respondents' assertions that he will no longer do this. It's considered one of the critical things when assessing whether they receive the maximum benefit from treatment. It's whether they have indicated a desire to resist from offending. Why would he have sent the Christmas card in 2005 to the boy that he dreamed about luring? Wasn't that the same boy or am I confusing that? I think there was only one boy and the boy was never lured. And we have here. Okay. The boy that he was dreaming about, he sent him a Christmas card, didn't he? Your Honor, yes. He did send him a Christmas card. Well, how does the expert testimony explain that? It's just a matter of IDD and the man was in his 40s. I think the man is still immature. Excuse me, I don't want to interrupt. No, go ahead. He was still an immature person, even in his 40s. But he was no longer offending. And now he's 60 and he has absolutely no interest in offending. And he has shown no interest in children. He has sent no one a Christmas card. He's actually only shown interest in adult women. This is his own testimony. Nobody is showing interest in anybody in this facility, right? Well, that's true. But there are ways. But we also have his own testimony about him going to go live with his sister, right? And then we have the telephone call where he's not living with his sister. He's saying both of those things? Your Honor, I would certainly ask the court to give credit to the district court who hears the testimony of Walter Wooden. I understand that. But those are two things that we can read as well. We don't have to look at how anybody is. We don't have to assess their credibility. We have his testimony and we have the telephone call. Right. Which the district court had as well. Indeed. And certainly Walter Wooden said some silly things on that phone call. But those are not things that would suggest that he's going to go out and offend against children. Well, it suggests that maybe he wasn't honest, though. If he said, I'll be living with my sister, and then as it turns out, that sister did not plan to have him live with her. No, Your Honor. That was never the plan was for him to live with this particular sister. I think that when you talk about Walter Wooden, you've got to understand that he's mentally retarded. And when a mentally retarded person. His IQ testing was 75? Yes, Your Honor. But as Dr. Winsman indicated, a large part of the assessment is functional behavior. And that's where Mr. Wooden falls woefully short. He talks to Walter Wooden's family to help him inform his opinion. And Walter Wooden's sisters know him quite well. And you can hear his sister saying, yeah, yeah, right, sure. She knows he's not going to live with her. These are the musings, as Dr. Winsman says. These are the musings of a mentally retarded person. So when Walter Wooden testifies in court, he is doing his absolute best to tell the trial judge the truth. We have his sister who has testified that she will allow him to live with her. So now Walter Wooden can relax. He does not have to say, oh, I'm going to get a job. Don't worry. I'm going to get out. I'm going to go to work. It's just a sort of childlike thinking that I've got to show that I'm going to go out and get a job so I can live with this sister. And then when his other sister shows up in court and actually says, no, you can live with me. My husband and I will take you in. In so many of these cases, there is not a single family member willing to even come to court, let alone allow these people into their homes. Walter Wooden was afraid, and his sister came and said, yes, you can live with us. We will take care of everything. You don't have to work. We will take you to the doctor. We will take you to get registered. We will make sure that everything is fine. And did the district court rely on that testimony? Yes, he did. And as far as the district court, the district court considered all of the evidence. This is a very detailed order. He weighed everything. And what the government is asking you to do is to simply credit the testimony of Dr. Maloney over that of the other experts. And that simply isn't appropriate. Dr. Maloney undermined his own credibility in so many ways in this case. And the district court pointed those out in his order. Dr. Maloney is the one who spent the least amount of time with Walter Wooden of all the experts. Dr. Maloney gave little credit to the fact that Walter Wooden is now 60 years old. He gave no credit to the fact that Walter Wooden is now in a wheelchair. He gave no credit to the fact that the actuarials will never change. He gave no credit to Walter Wooden's cogent release plan. But this is the opinion that the government would have you force the district court to weigh and to rule in favor of. And the district court considered all of that. He considered all of the factors that go into whether someone is dangerous. And what the district court, and I want to turn to what you were saying, Judge Fraxler, about whether the district court considered conditional release. Well, Judge Boyle made two findings that are abundantly clear. First, he found that the man does not suffer from a pedophilia or a paraphilia. So there was no reason to consider conditional release. Secondly, he found that he would not have serious difficulty refining. So, again, there is no reason to consider a conditional release. I think that argument stands in some tension, though, to the last, I don't know, three minutes of your argument where you were talking about the stability that the record shows he's getting in this situation. If he wasn't getting that stability, you wouldn't have that argument. So if he's not ordered to get that stability, and, in fact, because he is, according to himself, mentally retarded and immature, he might not go to the sister's house without that order. First of all, this man has never lived on his own. I didn't say he wasn't going to live on his own. I just said he wouldn't go to his sister's house or somewhere that we would think would be appropriate. Right, right. Well, I don't think there is so much in conflict. Dr. Winsman also addressed this issue, and he said that what you have with Walter Wooden is a person who, if anybody were going to be released and live under a bridge, that would change his assessment. So it's not simply that Walter Wooden has this great release plan. It's simply that no matter what his circumstances, no matter what his mental state, if he were going to be released onto the street without any support, that would weigh against him. Thank you. With regard to the judge's consideration of whether or not to institute a conditional release plan, the only thing I could find in the record is a statement where he says you don't have to have an exit plan in order to be decertified. But what I don't see is any decision. He doesn't need one. He can be released without one. I just don't see any reflection by the district judge as to whether or not one ought to be imposed since he hasn't decided to release him. That's the concern I have. Yes, sir. And I can only say that I believe the district court, if he felt that he needed conditions, he probably would have imposed them whether he felt the law allowed it or not. Well, he might have believed it if you argued that he doesn't have the authority. I just don't know because there's nothing in the record. I don't know that I'm arguing that he doesn't have the authority. I'm simply arguing that he felt no need to. Wasn't that in your brief that he didn't have the authority? Well, I think that's our general position regarding the Animals Act. You can't have two positions. Right, but I don't consider that to be this positive of the district court's ruling in this case. I think that he acted according to how he viewed the evidence in this case. So does he have the authority or doesn't he have the authority? Well, I think the act doesn't specifically give him the authority, and our probation office has indicated they don't know that they have the authority to supervise someone without statutory authority. I don't think the act gives him the authority. You do not? I do not think the act specifically gives him the authority, and it's been the case that our probation office has indicated they don't feel that they have the authority to supervise without some statutory basis for it. Thank you very much. Thank you. Do you have any rebuttals, sir? Thank you, Your Honor. I think the court's questions have just confirmed that there are some key questions that the district court hasn't answered, and that just reaffirms our position that this case should be remanded for further consideration. If the court wants to talk about the statutory question as to whether or not conditional release is authorized in a 4247H proceeding, I'd be happy to address that or any other questions that the court has. Otherwise, I think we'll rest on our briefs. Okay. Thank you very much. We will come down and say hello to the lawyers and then go directly to our next case.
judges: Diana Gribbon Motz, William B. Traxler, Jr., Barbara Milano Keenan